**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TIMOTHY MATTHEWS, | : | No. 4:15-CV-01898 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| INSINGER PERFORMANCE, INC., | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

**SEPTEMBER 11, 2017**

Defendant Insinger Performance, Inc., filed a motion for summary judgment on Count I of Plaintiff Timothy Matthews's complaint. For the reasons discussed below, the motion is granted.

## I.   BACKGROUND

### A.   Insinger Performance, Inc. and Its Employees

Insinger Performance, Inc. ("the Company") is a racing fuel distribution service based in Dushore, Pennsylvania, that operates in several states including Pennsylvania, New York, Delaware, New Jersey, and Maryland.[1]  Bruce Insinger owns the Company and has been its president since 1992.[2]  Brenda Insinger – Bruce Insinger's wife – occasionally assists at the Company, although she is

---

[1]   ECF No. 18, Ex. B at 9-10, 44.

[2]   *Id.* at 8-9.

neither an employee, owner, or officer of it.[3]   In 2014, around the time of the underlying events of this case, the Company employed five full-time employees.[4]

Timothy Matthews has had his Commercial Driver's License ("CDL") since 1999 and has 7 years' experience hauling fuel.[5]  He was hired by the Company as a driver in August 2013 and was immediately assigned to its facility in Newark, Delaware.[6]  There, he delivered bulk racing fuel, occasionally repackaged that fuel, and managed inventory.[7]   He was also responsible for answering the facility's phone, both to receive instructions from the Company and also to respond to customer inquiries.[8]  His starting wage was $18.75 per hour, and in early 2014, he began earning $19.75 per hour.[9]  He did not, however, receive health insurance through the company's health insurance policy.[10]   At all relevant times, Mr. Matthews was the Company's only African-American employee.[11]

While employed at the Company, Mr. Matthews became acquainted with Stephen Rochacewicz, a fellow employee with more than 35 years' experience in

---

[3]   *Id.* at 9; ECF No. 18, Ex. C at 9-12.

[4]   ECF No. 18, Ex. B at 10.

[5]   ECF No. 18, Ex. A at 19, 110.

[6]   *Id.* at 37, 40.

[7]   *Id.* at 43

[8]   *Id.* at 43-44.

[9]   *Id.* at 36.

[10]   *Id.* at 45.

[11]   ECF No. 18, Ex. B at 25.

racing fuels, lubes, and oils.[12]  Mr. Rochacewicz began working for the Company as a driver at its New Jersey facility in 2009, when Mr. Insinger bought out Mr. Rochacewicz's previous employer of 21 years.[13]  As part of this buyout, Mr. Insinger signed a sales agreement stipulating that he would match the wage – $25 per hour – that Mr. Rochacewicz had been receiving from his previous employer.[14] Until approximately 2011, Mr. Rochacewicz received health insurance through the Company's health insurance policy, but then, because that policy no longer covered out-of-state employees, he had to individually procure his own health insurance, for which the Company reimbursed him.[15]  In early 2014, Mr. Rochacewicz negotiated a raise with the Company and began earning $26 per hour.[16]

## B.    Mr. Matthews's Complaint and Termination

Sometime in June or July of 2014, Mr. Matthews complained, or began complaining, to Mr. Insinger about his workload – which he believed was too high – and his pay – which he felt was too low. [17]  At this time, he may also have asked Mr. Insinger whether the alleged high workload and low pay were due to racial

---

[12]   ECF No. 18, Ex. A at 21, 50.

[13]   ECF No. 18, Ex. F at 8.

[14]   ECF No. 18, Ex. B at 20-21.

[15]   ECF No. 18, Ex. E at 19-22.

[16]   ECF No. 18, Ex. F at 8-10.

[17]   ECF No. 18, Ex. A at 103-04, Ex. B at 48-49.

discrimination – *i.e.*, due to the fact that Mr. Matthews was African-American. Evidence on this issue is disputed: Mr. Matthews claims that he questioned Mr. Insinger about racial discrimination, but Mr. Insinger claims otherwise. [18] The timing of these complaints is also unclear from the record: Mr. Matthews claims that he first spoke to Mr. Insinger on these issues approximately "a month or so before [he] was terminated" and also insinuates that there may have been more than one conversation with Mr. Insinger on this topic after that initial discussion,[19] whereas Mr. Insinger seems to suggest that there was only one conversation, and that it took place in either June or July of 2014.[20]

For purposes of this motion, the Court will assume that Mr. Matthews questioned Mr. Insinger about racial discrimination, and that that conversation took place in July 2014, approximately one month before Mr. Matthews was terminated in August 2014. In any event, Mr. Insinger claims that he investigated Mr. Matthews's claims about his workload and pay, decided the claims were baseless, and did not respond to them.[21]

---

[18] *Compare* ECF No. 18, Ex. A at 103-05 *with* ECF No. 18, Ex. B at 49.

[19] ECF No. 18, Ex. A at 104 ("I was king of calling him and being a little more, hey, listen, we need to talk about this and find out, is this a racial thing or not . . .").

[20] ECF No. 18, Ex. B. at 48-49.

[21] *Id.* at 14, 48-50, 89.

In August 2014, Mr. Insinger drove to the Newark facility, gathered Mr. Matthews's belongings, and placed them outside the facility in a box.[22] When Mr. Matthews arrived, Mr. Insinger informed him that he was being terminated immediately.[23] Mr. Matthews had not received any advance warning that Mr. Insinger was going to terminate him, and, at the time it happened, Mr. Insinger did not specify his reasons for doing so.[24]

### C. Procedural History

On September 30, 2015, Mr. Matthews instituted the instant action.[25] His complaint alleged that he suffered various adverse employment consequences as a result of his race, including an increased workload, a failure to receive health insurance, lower pay, and his termination.[26] It also alleged that his termination was in retaliation for his complaints about this racial discrimination, and that all of these actions constituted a violation of 42 U.S.C. § 1981.[27] He requested injunctive relief, damages, and costs and expenses.[28]

---

[22] ECF No. 18, Ex. A at 66-71, Ex. B at 78-81.

[23] *Id.*

[24] *Id.*

[25] ECF No. 1.

[26] *Id.* ¶¶ 14, 17, 20, 26.

[27] *Id.* ¶¶ 28-31.

[28] *Id.* at 7-9.

On September 9, 2016, after the completion of discovery, the Company filed the instant motion for summary judgment.[29]  Several exhibits were attached to this motion, including transcripts of the depositions of Mr. and Mrs. Insinger, Mr. Matthews, David O'Donnell (one of the Company's employees), and Timothy Jessilonis (one of the Company's customers).

### D.    Deposition Testimony

Mr. Insinger, in his deposition, testified that he alone determines drivers' pay rates and that he bases them on "experience," which includes "[y]ears of CDL driving, driving time, knowledge of the . . . race fuels or fuels that [the Company] would use, [and] safety."[30]  He stated that new drivers start between $15 and $19 per hour, and that he did not pay Mr. Matthews's replacement – Mr. O'Donnell – more than $18.75 per hour when he was first hired.[31]

Mr. Insinger also testified that his decision to terminate Mr. Matthews was based on a "series of things that took place . . . in the last two months of [Mr. Matthews's] employment," including "continued tardiness," "customer complaints," unauthorized use of the Company's vehicle on personal time, and failure to restock the inventory at the Newark facility.[32]  He admitted, however,

---

[29]    ECF No. 18.

[30]    ECF No. 18, Ex. B at 14, 19.

[31]    *Id.* at 20.

[32]    *Id.* at 43-45, 68.

that he kept no records about the issues he had with Mr. Matthews's performance.[33]

Mrs. Insinger, in her deposition, testified that the Company's health insurance policy did not cover out-of-state employees like Mr. Matthews.[34]  She noted, however, that such employees would be reimbursed for the cost of purchasing their own health insurance, and that she had a conversation with Mr. Matthews about this at a trade expo in January 2014, at which time she gave him the phone number of an insurance broker who could assist him.[35]

Mr. O'Donnell, in his deposition, testified that he was hired by the Company as a driver in March 2015 to replace Mr. Matthews, several months after Mr. Matthews's termination.[36]  He stated that he has his CDL, that he has owned and worked for "automotive performance" shops "all [his] life" and that, at the time he was hired by the Company, was employed by one of the Company's customers, a drag racing facility in Maryland.[37]  He also noted that he started as a part-time employee at the Company making $20 per hour, but in February 2016, he was made full-time and began making $21 per hour.[38]

---

[33]  *Id.* at 42.

[34]  ECF No. 18, Ex. C at 15.

[35]  *Id.* at 15-16.

[36]  ECF No. 18, Ex. E at 11.

[37]  ECF No. 18, Ex. D at 9-13, 20-21, 25.

[38]  *Id.* at 17, 24-25.

Mr. Matthews, in his deposition, claimed that Mr. Insinger gave him permission to use the Company's vehicle on personal time.[39] He also remembered having a conversation with Mrs. Insinger about health insurance at the January 2014 trade expo, but stated that he did not understand why he did not receive health insurance and that he did not call the number provided to him by Mrs. Insinger.[40]

Finally, Mr. Jessilonis, in his deposition, stated that he was a regular customer of the Company, had dealt with Mr. Matthews on numerous occasions, and that he "never had any problems" with Mr. Matthews's performance.[41]

## II.    DISCUSSION

### A.    Standard of Review

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[42] A dispute is "genuine if a reasonable trier-of-fact could find in favor of the non-movant," and "material if it could affect the outcome of the case."[43] To defeat a motion for summary judgment, then, the nonmoving party

---

[39]  ECF No. 18, Ex. A at 63.

[40]  *Id.* at 45-47.

[41]  *Id.* at 7, 15.

[42]  Federal Rule of Civil Procedure 56(a).

[43]  *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 300 (3rd Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 252 (1986).

must point to evidence in the record that would allow jury to rule in that party's favor.[44]  When deciding whether to grant summary judgment, a court should draw all reasonable inferences in favor of the non-moving party.[45]

### B.    Discrimination Claims Under 42 U.S.C. § 1981

Section 1981 of Title 42 of the United States Code gives "[a]ll persons within the jurisdiction of the United States . . . the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings . . . as is enjoyed by white citizens."  Among its other functions, the statute "affords a federal remedy against discrimination in private employment on the basis of race."[46]

The United States Court of Appeals for the Third Circuit has recently outlined the three-step procedure for analyzing these claims:

> [Employment discrimination claims under § 1981] are subject to the same analysis as discrimination claims under Title VII of the Civil Rights Act of 1964.  Accordingly, a court reviews them under the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, a plaintiff first must establish the requisite elements of his claim (called the *prima facie* elements); if [he does] so, the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action, and then the plaintiff bears the burden

---

[44]   Federal Rule of Civil Procedure 56(c)(1); *Liberty Lobby*, 477 U.S. at 249.

[45]   *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

[46]   *Roebuck v. Drexel University*, 852 F.2d 715, 725 n.13 (3rd Cir. 1988) (quoting *Johnson v. Railway Express Agency*, 421 U.S. 454, 459-60 (1975).

of establishing that the employer's stated reason for the adverse action was an excuse, or pretext, for why the action was actually taken.[47]

The first step, then, is to consider whether a plaintiff has established a *prima facie* case of racial discrimination, the elements of which "depend on the facts of the particular case."[48] At the very least, however, a plaintiff must show that he was a member of a protected class and that he suffered an "adverse employment action . . . under circumstances that could give rise to an inference of intentional discrimination."[49]

At the second step, the defendant-employer must "articulate some legitimate, nondiscriminatory reason for" the adverse employment action.[50] The employer does this by

> introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. The employer need not prove that the tendered reason *actually* motivated [his] behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff.[51]

---

[47] *Castleberry v. STI Group*, 863 F.3d 259, 263 (3rd Cir. 2017) (internal quotation marks and citations omitted).

[48] *Jones v. School Dist. Of Philadelphia*, 198 F.3d 403, 411 (3rd Cir. 1999).

[49] *Makky v. Chertoff*, 541 F.3d 205, 214 (3rd Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

[50] *Fuentes v. Perskie*, 32 F.3d 759, 763 (3rd Cir. 1994) (quoting *McDonnell Douglas*, 411 U.S. at 802).

[51] *Fuentes*, 32 F.3d at 763 (3rd Cir. 1994) (emphasis in original) (internal citations omitted).

Finally, at the third step, the plaintiff must "show by a preponderance of the evidence that the employer's explanation is pretextual."[52] When a court is considering the matter at the summary judgment stage,

> the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.[53]

Because the plaintiff, at this step, has already established the elements of his *prima facie* case, he can defeat a motion for summary judgment

> by either (i) discrediting the [defendant's] proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. Thus, if the plaintiff has pointed to evidence sufficiently to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her *prima facie* case.[54]

This evidence, however, "must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action."[55] It is not enough for the plaintiff to "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory

---

[52] *Id.*

[53] *Id.* at 764. (emphasis in original).

[54] *Id.*

[55] *Id.* (emphasis in original).

animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."[56]   Instead, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons."[57]

Under this framework, the plaintiff bears an admittedly "difficult burden,"[58] as he "must show not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason."[59] This difficulty, however, is directly attributable to the "inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs."[60]

### 1.   Unequal Pay

Mr. Matthews claims that he was paid less than white workers because he is African-American.    Because the Company has offered "legitimate, nondiscriminatory reasons" for any pay differential that may exist, and because

---

[56]   *Id.* at 765.

[57]   *Id.* (emphasis in original) (internal quotation marks and citations omitted).

[58]   *Id.*

[59]   *Atkinson v. LaFayette College*, 460 F.3d 447, 454 (3rd Cir. 2006) (internal quotation marks and citation omitted).

[60]   *Fuentes v. Perskie*, 32 F.3d 759, 765 (3rd Cir. 1994) (quoting *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 531 (3rd Cir. 1992)).

Mr. Matthews has failed to show that the Company's explanations are pretextual, Mr. Matthews's claim of unequal pay must fail.

The parties do not dispute that Mr. Matthews, an African-American, is a member of a protected class, or that unequal pay is an actionable adverse employment action. However, when a plaintiff alleges unequal pay, he must show that he was "performing work substantially equal to [those not in his protected class] who were compensated at higher rates."[61] Mr. Matthews, then, must identify employees (1) whose duties at the Company were similar to his and (2) who were paid more than he was for performing those duties.

Mr. Matthews has arguably identified two such employees: Mr. Rochacewicz and Mr. O'Donnell.[62] All three men were employed as drivers for

---

[61] *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1087 (3rd Cir. 1996) (internal quotation marks and citation omitted).

[62] Mr. Matthews attempts to compare his hourly wage to the wages of a host of other employees that appear on an "Payroll Journal" attached to his Brief in Opposition to Defendant's Motion for Summary Judgment. ECF No. 23, Ex. 4. In the first place, Mr. Matthews fails to produce any evidence that any of these employees were "performing work substantially equal" to the work he performed at the Company – *i.e.*, were employed as drivers at the Company. In the second place, even if we assume that all of these employees were so similarly situated, the evidence cuts against Mr. Matthews' wage discrimination claim. Besides Mr. Matthews, Mr. Rochacewicz, and Mr. O'Donnell, the Payroll Journal lists 12 other employees (Arrison, Gilbert, Highley, Jankowsky, Keiffer, Lewis, Milo, Mosher, Mullen, Selleck, Snyder, and Todd – none of whom, according to the undisputed evidence, were African-American) whose listed wages ($20, $14.50, $20, $20, $19, $16.58, $18, $20, $22, $22, $17, and $22, respectively) average $19.26 per hour - $0.49 *less* per hour than Mr. Matthews' wage in 2014. In his Brief, Mr. Matthews attempts to avoid this difficulty by plucking from this list the employees earning at least $20 per hour and comparing them to Mr. Matthews' wage of $19.75 per hour. As noted, however, there is no evidence that *any* of the employees on the list were employed as drivers, so there is necessarily no evidence that the carefully-selected employees were drivers, either.

the Company, so they were all "performing . . . substantially equal" work.  And it is undisputed that Mr. Rochacewicz was earning more than Mr. Matthews; in 2014, Mr. Rochacewicz was earning $26 per hour while Mr. Matthews was earning $19.75.  It is more difficult to compare Mr. O'Donnell's wages to Mr. Matthews's, since they were never employed at the same time.  When Mr. Matthews left the Company in 2014, he was earning $19.75 per hour, and when Mr. O'Donnell began working at the Company in 2015, he was earning $20.  One may question whether a $0.25 difference in wages (an increase of less than 1.27%) measured across the span of nearly a year "give[s] rise to an inference of intentional discrimination."  Nevertheless, this Court will proceed to the next analytical steps on the assumption that Mr. Matthews has carried his initial burden.

Mr. Insinger testified that he alone determines drivers' pay rates and bases them on "experience," which he defines to include "[y]ears of CDL driving, driving time, knowledge of the race fuels or fuels that [the Company] would use, [and] safety."  Mr. Insinger also testified that Mr. Rochacewicz's initial wage at the Company was contractually determined by a sales agreement.  Mr. Matthews does not dispute that these are, facially at least, legitimate, nondiscriminatory reasons for any wage difference.  He does, however, argue that these reasons are pretextual.  The evidence in the record, however, does not support his argument.

There is evidence that Mr. Rochacewiz and Mr. O'Donnell have superior "experience," as defined by Mr. Insinger: Mr. Matthews hauled fuel for only 7 years, while Mr. Rochacewicz has worked in the field for more than 35 years and Mr. O'Donnell has worked in it "all [his] life." Rather than focus on this experience factor, however, Mr. Matthews points to inconsistencies in the deposition testimonies of Mr. Insinger and Mr. O'Donnell. Mr. Insinger claimed to pay Mr. O'Donnell less than $18.75 per hour while Mr. O'Donnell claimed to have earned $20.[63] Mr. Insinger also claimed that Mr. Matthews's allegations of unequal pay in June or July of 2014 were baseless, while it is undisputed that at least one driver – Mr. Rochacewicz – was earning more than Mr. Matthews at that time. These inconsistencies, however, are minor, and not "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that would allow a jury to disbelieve the Company's rational for the unequal pay. Mr. Matthews has not shown that rationale to be "so plainly wrong that it cannot have been the employer's real reason," and his claim of racially discriminatory unequal pay, therefore, fails.

### 2. Termination

Mr. Matthews also claims that his termination from the Company was due to racial discrimination. Again, because the Company has offered "legitimate,

---

[63] The "Payroll Journal," mentioned *supra*, supports Mr. O'Donnell's testimony.

nondiscriminatory reasons" for Mr. Matthews's termination, and because Mr. Matthews has failed to show that the Company's explanations are pretextual, Mr. Matthews's claim of racially discriminatory termination must fail.

In sum, the parties do not dispute that Mr. Matthews, an African-American, is a member of a protected class, or that termination is an actionable adverse employment action. This Court will also assume that this "adverse employment action" occurred "under circumstances that could give rise to an inference of intentional discrimination" – *i.e.*, it will assume that Mr. Matthews has established his *prima facie* case.

Mr. Insinger testified that his decision to terminate Mr. Matthews was based on a "series of things that took place . . . in the last two months of [Mr. Matthews's] employment," including "continued tardiness," "customer complaints," unauthorized use of the Company's vehicle on personal time, and failure to restock the inventory at the Newark facility. Mr. Matthews does not dispute that these are, facially at least, legitimate, nondiscriminatory reasons for his termination. He does, however, argue that these reasons are pretextual. Just like with the unequal pay claim, however, the evidence in the record does not support his argument.

In his attempt to assail the Company's stated rationale as pretextual, Mr. Matthews points to various pieces of evidence in the record. He notes that Mr.

Insinger admitted to keeping no records about any issues he may have had with Mr. Matthews's work performance – *i.e.*, he kept no records about Mr. Matthews's alleged "continued tardiness" or the "customer complaints" about him. At the time of the termination, however, the Company employed only five full-time employees; it is unsurprising that such a small business did not keep detailed, written records of its employees affairs.

Mr. Matthews also points to Mr. Jessilonis's testimony that he "never had any problems" with Mr. Matthews. The fact that a single one of the Company's customers failed to complain about Mr. Matthews's work performance, however, sheds no light on how other customers felt, especially when there is no evidence in the record as to how many other customers the Company had or what percentage of the Company's business was due to Mr. Jessilonis's purchases.

Finally, Mr. Matthews points to his own testimony indicating that Mr. Insinger gave him permission to use the Company's vehicle on personal time. Even if this Court were to resolve this factual dispute in Mr. Matthews's favor, that fact – even in combination with other evidence he points to on this issue – is insufficient to allow a jury to disbelieve *each* of the Company's stated rationales for Mr. Matthews's termination, especially since Mr. Matthews has pointed to *no* evidence that disputes Mr. Insinger's claim that Mr. Matthews failed to restock the inventory at the Newark facility. Again, Mr. Matthews has not shown the

Company's rationale for his termination to be "so plainly wrong that it cannot have been the employer's real reason," and his claim of racially discriminatory termination, therefore, fails.

### 3. Unequal Benefits and Workloads

Finally, Mr. Matthews claims that he was denied health insurance and given an increased workload because of his race. Both of these claims fail.

The evidence is undisputed that the Company did not provide health insurance to Mr. Matthews because he was an out-of-state employee, not because he was African-American. Both Mrs. Insinger and Mr. Matthews testified about a conversation to this effect at a January 2014 trade expo, and Mr. Rochacewicz – another out-of-state employee – testified that he did not receive health insurance from the Company and had to purchase his own. Although Mr. Matthews claims that he did not understand this arrangement, the record neither establishes a *prima facie* case of racial discrimination on this claim nor tends to show that the Company's stated policy for out-of-state employees was pretextual.

Mr. Matthews seems to have abandoned his argument that he was subject to an increased workload because of his race. In any event, he points to no evidence in the record supporting this claim, and a careful reading of the record reveals none.

## C.   Retaliation Claim Under 42 U.S.C. §1981

In addition to prohibiting racial discrimination in private employment, 42 U.S.C. § 1981 also bars employers from retaliating against employees who voice concerns about such discrimination.[64]   Such retaliation claims are, like discrimination claims, analyzed under the *McDonnell Douglas* burden-shifting framework.[65]   To establish a *prima facie* case of retaliation, a plaintiff must prove (1) that he engaged in protected activity, (2) that he suffered an adverse employment action, and (3) that a causal connection exists between the protected activity and the adverse employment activity.[66]   To show the requisite causal connection, a plaintiff can show that the temporal proximity between the protected activity and the adverse employment action is "unusually suggestive"; a plaintiff may also point to "circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action."[67]

For purposes of this motion, the Court will assume that Mr. Matthews was engaged in protected activity when he raised his work-related complaints with Mr.

---

[64]   *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3rd Cir. 2010) (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008)).

[65]   *Daniels v. School Dist. of Philadelphia*, 776 F.3d 181, 193 (3rd Cir. 2015).

[66]   *Id.*

[67]   *Id.* at 196.

Insinger in June or July of 2014, and that he suffered an adverse employment action – *i.e.*, he was terminated – after making those complaints. Mr. Matthews, however, fails to establish the third prong of his *prima facie* case, the causal connection between those two events. The timing between them is not unusually suggestive; even accepting Mr. Matthews's version of the events as true, there was a one-month gap between his complaint and his termination.[68] There are no glaring "inconsistencies" in the reasons given by Mr. Insinger for Mr. Matthews's termination; the minor issues that Mr. Matthews has with those proffered reasons have all been discussed and rejected *supra* in § II.B.2.[69] And Mr. Matthews points to no other evidence showing any "intervening antagonism" or "retaliatory animus" on Mr. Insinger's behalf.

Furthermore, even if Mr. Matthews had established the requisite causal connection, he still fails at step three of the *McDonnell Douglas* analysis – *i.e.*, he has failed to show that the Company's proffered explanation for his termination is pretextual – for the reasons stated *supra* in § II.B.2.

---

[68] *See, e.g.*, *Alers v. City of Philadelphia*, 919 F.Supp.2d 528, 552 (E.D. Pa. 2013) (holding that a one-month gap is not unusually suggestive); *Thomas-Taylor v. City of Pittsburgh*, 605 Fed.Appx. 95, 99 (3rd Cir. 2015) (unpublished opinion) (same).

[69] As another "inconsistency," Mr. Matthews claims that Mr. Insinger was untruthful when he found Mr. Matthews' pay complaint baseless. This argument has been discussed and rejected *supra* in § II.B.1.

## III.   CONCLUSION

Mr. Matthews has failed to establish a *prima facie* case of discrimination as it relates to his alleged unequal workload and his failure to receive health insurance from the Company, and has failed to established a *prima facie* case of retaliation. He has also failed to establish that the Company's explanations for his pay and his termination were pretextual.   Therefore, his claim of discrimination and of retaliation in violation of 42 U.S.C. § 1981 fails, and the Company's motion for summary judgment is granted.

An appropriate Order follows.


BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge